The pleasure of a motion. The motion is going to come from me, so I have to cede the chair to Judge Prost. And I'm happy to recognize the Chief. Thank you. I'd like to move the admission of one of the wonderful law clerks that has worked for me, Ms. Jennifer Nock, who is a member in good standing of the Bar of Virginia, and she has served me and the Court with great distinction. I look forward to accepting her service in our Bar for many years to come if my colleagues will cede to her membership. Well, I'd enthusiastically, along with Judge Moore, grant your motion. And I think we'd ask you to administer the oath, Mr. Horvitz. Please raise your right hand. I just want to affirm that if you comport yourself as an attorney and counsel to this Court, I'll privately and according to law issue a support to the Constitution of the United States of America. Congratulations to the Bar of the United States Court of Appeals. Thank you. Then we'll proceed with our first case this morning. We'll, after this case, then take a recess for the cases that follow. But our first case this morning is Versada v. SAP. Mr. Jakes. Good morning, and may it please the Court. SAP has appealed several issues in this case. I'd like to start by talking about the infringement based on hierarchical access, and if time permits, talk about lost profits and the injunction. In this case, to make SAP software perform the functions that were recited in the claims, Versada had to do several things. They had to create an access sequence, they had to create a condition type, and they had to modify an existing pricing procedure. So then the infringement question really reduces to, are these computer instructions? Because the claims require computer instructions either to implement or capable of performing these functions. Well, Mr. Jakes, the language here is capable of, which is quite broad, and you've been on the other side of this podium as well. We've got a jury verdict here. Yes. Let's assume that the jury believed everything Mr. Nettles said, and also concurred in by the cross-examination testimony of your own expert witnesses. Why does that not leave us with sufficient evidence in which to state the verdict here? Your Honor, Nettles did make conclusory statements that the functions were present in SAP software. So you have to go one level deeper than that, and you have to look at what these things were that he actually did, the access sequence, the pricing procedure, the condition type. And the record on those is undisputed and clear as to what they actually do. And, for example, the access sequence, it tells the computer where to retrieve the information and in what order to do it. That's in the documentation that he relied on, and that's in the testimony. Dr. Nettles said that an access sequence is the thing that actually does the hierarchical access. So the fact that he said these things are data, that's really a conclusion. If you look at what they actually do— Well, he just used the SAP user interface. He didn't modify source code or write any code. He just used the user interface and sat there and entered in, in response to queries, exactly what the user interface required him to do. So how is it that he wrote code, as you suggested? We're not saying he wrote source code. And, actually, I think that's where the district court went wrong. The district court, in its opinion on the 400 patent, said there was no infringement because these were computer instructions and they were necessary to perform the functions. And I think source code is something that sidetracks you because that's not what the claims say. They don't say source code. They say computer instructions. But if he was just using—back to my question, though. If he was just using the SAP user interface and entering in data, I don't understand the argument, really. I think that assumes the conclusion that he was entering data. He was entering instructions. That's our position. You can use any type of interface to enter instructions. The instructions are what tell the computer what to do. But aren't the instructions like individual or retailer or something like that? What are the nature of the instructions? Because here's your problem. You touched on so many issues that it's in such a cursory fashion that I've spent an enormous amount of time with these appendices and I can't get the details of your argument. And so when you're up against a substantial evidence jury verdict, that leaves you at a loss. So I need to know exactly what he did and tell me where the best evidence is to show it. Okay. Let's look at his demonstration. He created an access sequence. He created a condition type and he modified a pricing procedure. SAP software comes- He modified a pricing procedure. That's right. He entered in response to queries on the SAP user interface what particular procedure ought to apply, right? He modified a pricing procedure. I mean, he wasn't sitting there modifying the program. He was responding to the program, entering in the data it called for, correct? Yes, you're right, Your Honor. The program does give the user many, many, many options. But that doesn't mean that the computer instructions are there to perform these functions. But didn't your expert himself testify that every single modification performed by Dr. Nettles was part of the capability? No, I don't think he did, Your Honor. I think if you look at his testimony, he's talking about the source code. He said, yes, the source code has that capability. But he's talking broadly. He's talking, yes, a user could use it to do those things. But as delivered by SAP, it doesn't. And so that's why he had to create these new procedures. But it's not unusual for customers to do that. That's part of the testimony that also comes from your expert. It was expected, I think, was the language that was used. The customers can use the software in many, many different ways. But to say that it was expected that customers would perform these particular functions, there isn't any evidence of that. What we're talking about is using hierarchical access on both a customer and a product hierarchy to determine a single price. The software comes with a number of pricing procedures. It comes with a number of condition types. And it was capable of doing those things individually. But that's just it. The software only has to be capable of performing these functions. And he entered in data. And then it performed the function. So how is that not capable? I disagree that he entered in data. And I think that assumes the conclusion that what he was entering was data. Data is something like a number that represents something like 200 euros. Couldn't data be a condition? Couldn't it be a condition? I mean, he's responding to SAP query. And he's entering in information. That's right. Just because it's a data entry screen doesn't mean that the numbers, the things that are being entered in are data. And I think that's really the heart of it. If you look at what these things do and what they're described as, as Dr. Nettle said, the access sequence, it's the thing that actually does the access. It tells you where to go and in what order. It's not a number. It's not like 200 euros. It's not 15%. It tells you how to get these numbers and how to assemble them. If you look at the documentation, for example, that he also relied on, it's fairly specific. For example, a condition type, which is a condition, at A5464, it specifies information about how the system processes and calculates pricing. That's not data. And that's really where the mistake was. To say that's data is not supported in the record. Can I move you on to the lost profits question? Yes, you are. Once again, you've got a jury verdict and there's a bit of a hurdle to overcome. It seems to me that in the briefings you try to make a legal argument with respect to the use of the various levels, the tiers. And you try to turn that into a question of law rather than a question of fact. Can you just go through that quickly with me? Yes, there are two aspects to the lost profits. Really what it comes down to is there's a lack of causation in fact. We also go into the way that Versada's expert dealt with this purporting to apply the Panduit factors. Now, we went through the Panduit analysis that the expert did. We don't think that's correct because in doing that he switched between various markets. And it's because it doesn't work in this market. This is an unusual situation where in order for Versada's theory to make any sense, SAP had to make the sales because there was nothing to bolt on to if they didn't. But the cases apply a pretty lenient standard in terms of speculation. And it seems to me that just moving from one tier to another or from one market to another with respect to the various Panduit factors doesn't necessarily implicate a problem, a legal problem, right? Well, your honors, as far as I know, no case has endorsed that type of methodology. And really the Panduit is just one way to prove causation. But if it doesn't work because you're – for example, as Versada's expert did, it showed demand. He showed demand for SAP's product. That was the general ERP, enterprise resource planning software in the market. And then when he had to show there were no non-infringing substitutes, he had to go to the very specific bolt-on market to the SAP software. That falls apart when you're trying to prove causation. And that's really the issue here. Did SAP's inclusion of this capability, assuming there was infringement and we disagree on that, did that somehow cause Versada to lose sales? And the overall economic evidence doesn't support that. You didn't dispute the non-infringing substitute, right? In that specific market. See, the thing is when you switch, it makes it a different question. There is no doubt that there were substitutes in a broader sense for SAP's ERP software. The Oracle software. Oracle, for example. But when you confine it to – Tier 1 SAP customer. Tier 1 pricing software that you can bolt on to SAP, that's true. And so that's the problem. It's when you look at the demand for SAP's product and say, well, it's just demand for their ERP software. Then you say the alternatives are just confined to this narrow market. It shows the gyrations they had to do to kind of pigeonhole everything into this Panduit analysis. And it falls apart because of the lack of causation. Let me see if I understand your argument. Your argument, as I understand it, is that they focused for market purposes on Tier 1 SAP customers only. Because that's the only market where there's no non-infringing substitute, right? That's right. Okay, and that's what you agreed to. But then you said they came along later, though, and their expert used the 35% number. Which was improper because that's a number for all pitches in all circumstances. That's right. And that if they had used the percent of people they realized only of SAP customers, the market would be 2.5%. That's exactly right. I got it. But here's your problem. I've got to understand the 2.5 number, which I don't. Okay, it's a lot of hand-waving. Let me explain why. If the 2.5 number is the result of SAP coming on the market and offering the infringing product, then it's not at all surprising that none of the Versata customers, none of the SAP customers, wanted to then buy a product from Versata they already had contained within the SAP software. Then you have to back it back out and say, well, if I can't really use that number for that reason, what would be a logical number to use and why wouldn't it be the 35% number, which is their realization rate against all pitches? There's my question. Okay. I think there are two answers to that. The first one has to do with the timing. The 2.5% comes before SAP included hierarchical access. So you're saying the 2.5% is a legitimate number at a time where SAP customers did not have that functionality. That's right. And there's a specific testimony and documentation on that. Is there any dispute about that? I don't believe so. Let me reinforce that with my second point, which is Versata didn't know that SAP had this capability, and there's no evidence that any customer of SAP ever used this capability. So you take that and you say, how could that prevent Versata from making sales if no one was actually using it? It really just falls apart on causation. Procedurally, you don't challenge the non-infringing substitutes, but you purport to challenge the methodology, and yet in the Daubert motion context, you kind of waived your challenge to methodology. I'm trying to figure out if you've put yourself in a box you can't get out of. I don't think so, Your Honor. There was a Daubert challenge on lost profits, and it was to the way that the expert had constructed this. Now, remember, in the first trial, Versata didn't even seek loss. And there you explicitly do not question the methodology. Am I correct on that? Your Honor, I think it really turns on what we mean by methodology. We say he did it wrong, and it shouldn't be admitted. Now, I've used the term methodology because sometimes when you look at Pandora— I would have thought you weren't contesting the methodology. It's difficult to argue that Pandora is not a proper way to do a lost profits analysis, and he purported to do that. Now, when you look at the evidence of what he actually put in and the switching between markets, that should have been excluded, but it wasn't. But we still have to look at that record, and is that substantial evidence to support the causation? The causation, in fact, that SAP's inclusion of this feature somehow caused Versata to lose sales. I just need to back up to my question again for a minute. So if I accept everything you say is true and there's no dispute that as to SAP Tier 1 customers, they only had a realization of 2.5 percent at a time when you weren't offering infringing product. Yes. But then their expert and everyone agrees it's also a matter of fact that of all the pitches they went on, generally they had a realization or a win rate of 35 percent. Right. Both of these numbers were put before the jury. Can I really say the jury didn't have substantial evidence to accept the 35 percent number? I mean, look, if it was De Novo, I'm with you, but it's not. It's a really high and deferential standard. So what do we do? Well, Your Honor, I think that Versata made a choice as to what market they were going after, and they said it was SAP customers Tier 1 bolt-on software. And then to turn around and use 35 percent in the overall market when there is more precise economic evidence that it was only 2.5 percent, I think it would be unreasonable for a jury to make that mistake. They may have made that mistake, but it would be wrong and unreasonable. So I don't think that can satisfy as substantial evidence. And if I could just briefly touch on the injunction. The injunction issue, it should be vacated. The injunction here, it prohibits SAP from engaging in non-infringing activity. SAP is not challenging that an injunction was entered. It's not providing this hierarchical access in new software. But since Versata was awarded damages for past sales, those past sales are fully licensed for those customers that have it, and SAP should be able to… I don't understand. You want to expand the number of users, though. I mean, a software license is not an unlimited license. It can be. It can be. You can license a customer for as many seats as they want. And that was the way that Versata presented its damages case. They did it on a per-customer basis. They could have done it on a per-seat basis, but they chose to do it on a per-customer basis. And having chosen that, they can't turn around and say, well, now you couldn't expand the number of seats. They could have limited it that way. They didn't. And on the maintenance, maintenance is simply akin to repair in this situation for those users who would already have been compensated by the damages award. And to prohibit maintenance in this situation, it's prohibiting a non-infringing activity. Thank you, Mr. Jacobs. We'll restore your rebuttal time. It got consumed in the questions. Thank you. Could you give Mr. McCool an extra four minutes if he needs to use it? And that'll keep the timing. Mr. McCool? Thank you, Chief Judge. My name is Mike McCool, and I represent Versata. As the court heard this morning, SAP directs the bulk of its non-infringement argument against the experts' demonstration. But in this case, which involves a sufficiency of the evidence, what it doesn't address I want to bring to the court's attention because it's Versata's primary proof of infringement. And that was an expert analysis of the accused software, very carefully done, covered 50 pages of trial transcript, starting on page 1436 of your appendix. And this analysis was particularly illuminating because instead of conclusory opinions that the source code performs the claimed operations, it was based on and supported by comments that were written by SAP's programmers and interlined with the source code written in prose that describe the function of every line of source code. Now, SAP says that the key to the infringement issue is whether the software performs hierarchical access on customer and product hierarchies. You heard that this morning. That source code itself calls out customer hierarchies. It calls out product hierarchies by name and shows that it operates on them and deals with them, and that it performs hierarchical access on those. At page 26713 of the appendix is a page from the source code. It says, and I'm quoting, for implementation of hierarchical access, each record is checked, record of highest priority is returned. That is the inventive leap in the patent, to scoop up all of the potentially relevant records rather than to process each table one at a time and to return only the highest priority record. So the proof, the primary proof of infringement was done in that source code analysis. But now let's turn to the demonstration. Could I switch it for a second to the damages analysis? I do think Mr. Jakes is right. I couldn't find another case that seems to apply Panduit and the methodology as this does. Can you tell us what the substantial evidence is for damages? Let me begin with demand. There are only two Panduit issues here, demand and amount lost. The trial court detailed the Panduit demand evidence on pages 47 and 48 of this appendix, which is in his Jamal opinion. He started with the fact that the market showed extreme demand for Versada's Pricer. That is the patent's preferred embodiment. There could be no better evidence of demand. Amazingly, for multimillion dollar software sold to enterprises, it sold over 60 units in less than three years. Forty-five of those sales were to blue chip tier one companies like IBM, Lucent, Motorola, Hewlett Packard. They paid millions of dollars even though they already had SAP's pricing functionality. SAP recognized the demand for the product. We put it in our brief. The big question is whether you can use evidence outside the damages period to show demand. Well, it starts there. I think we need to show that it goes into the damages period, and we do. First, as the trial court pointed out, SAP, the evidence was uncontradicted. They don't incorporate functionality into their suite unless there's broad demand for the feature. And second, they had a 2008 study, which they did of their customers' needs, and they rated those by categories. Hierarchy-based pricing maintenance was rated an absolute must. That at page 3712 and 13 of your appendix. SAP touted the benefits of this feature, the same benefits that the patent touted, and that's at page 8430, and had it on their website during the entire damages period. In addition, there was evidence that the need for the invention during the damages period increased during the damages period for two reasons. The rise of the internet, which made it easy for every customer now to call in at all times of the day and ask for a price quote. So the computational efficiency of the invention made it more important. There were no sales of Pricer from 2003 to 2011. That's right. The market for Pricer was destroyed. When did SAP start introducing the infringing functionality? October 1998. That's when it started introducing the infringing functionality. That's when it was actually in the product. When did your patent issue? 2003. So they weren't infringing. They weren't infringing. The question is demand. And the question is that as of 2003, what was the use of the infringing technology by SAP doing? But clearly the market for Pricer was destroyed in 1998 because the market was for SAP customers. If they could get it for free, this is an I4I situation. If they could get it for free by bundling into the suite, they had no reason to pay many millions of dollars to Versada, which they were doing prior to the bundling. And that's why the prior evidence is important because the inference is strong. They sold 60 units in three years. It gets bundled. The market's destroyed. And in addition, the refusal of SAP to remove the feature after the 2010 infringement finding, the court found to be persuasive evidence of demand. And Gyromat versus Champion made that point. Can I move you on to the discussion that I had with Mr. Jakes, though, about the market in particular? You agree that the market, as you established for Panduit purposes, is Tier 1 SAP clients, right? That's correct, Your Honor. But the 35% number is an overall number that is not unique to Tier 1 SAP customers. It is. Let me address the 35% number. The 35% number wasn't used by the expert. He pointed out, Your Honor, if I might, he pointed out that this 35% number was there. He pointed out it was some evidence. There were 435 infringing sales. He concluded that Versada would win 93 of those. That's a 21% win rate. He didn't apply the 35%. It would have been 152 sales if he had applied the 35%. He said that in the context of 2003 to 2011, given the fact they had to ramp up, and prior to 2003, there wasn't infringement. There was nothing wrong with what SAP was doing in that period. They would have to ramp up. They would have to sell, and they couldn't do it at that rate. So he didn't apply 35% to his opinion. Well, I thought the analysis was, and maybe I get this from the Jamal discussion by the district court, that he did apply the 35%, but then he discounted it to reflect Versada's historical sales in 96 and 97 and 98. Isn't that the way the analysis went? Well, yes, Your Honor. To say he didn't apply, he certainly didn't apply it in the sense of using 35%. That's crystal clear. But he did say this is evidence. This is some evidence, and it's persuasive evidence. I understood it. Maybe I'm unclear on something. He used the 35%, and then he backed out certain numbers, historical numbers from 96, 97, and 98. Am I wrong about that? Well, exactly. I mean, I think he said the 35% is relevant to this analysis. But what I'm saying is he didn't use it. He backed out based on real-world factors. He looked, as Unilock requires, at the feature's actual footprint in the marketplace, and that's why this is a good expert analysis because he saw it. He said it's persuasive, but I can't really use it when it comes to the damages period, and he didn't. He used 93 sales, which is a 21% win rate. So the second thing I want to talk about is the 2.5%, which Judge Moore asked about earlier. Now, the 2.5% win rate was not a price or win rate overall for its sales. And I urge the court to look at it. 5271 to 5277 in the appendix. It is a study done by Versado. They had traditionally done their marketing to the business units, to the CEOs, the CFOs, and they had been very successful. They had luck with Goodyear going to the IT departments. They thought, let's give that a try. They went to 40 companies, and they couldn't sell. There are two things about this. Number one, simultaneously, their efforts of going to the business units was extremely successful. In the same year that this came out, they sold 25 units right before SAP came out with the functionality. And it's sweet. But the second thing about it is that... Wait, if they sold 25 units, this would have been in the mid-90s? 98. 98. That's the year this study came out. But the study says, we've got to go back to our traditional way of selling. These IT people are too sold on SAP. They work with them every day. We've got to talk to the CFO. And when they did, they were successful. And the track record of the sales of Pricer is undisputed. In fact, there's evidence in the record from SAP's internal documentation where they said Pricer dominates the market. That at 91.52. So that the 2% number is not an overall number. That it could be used for the sales of Pricer. And if I might turn to the injunction before I run out of time. Point one. The jury's royalty award did not license future use. The expert Wagner, who gave the testimony, said, and I'm quoting from 42.27, that his royalty calculation, quote, stops at the day of trial. The jury instruction was, quote, you should award damages until today. That on page 43.24. The paragraph that SAP relies on is at appendix page 43.28. It refers to prior users and says, your damages award will compensate Versada for that infringement. That prior infringement. SAP's quote on page 42 of its yellow brief makes it read very differently because they put ellipses in place of the single word that. To remove the reference to prior users. And secondly, one thing needs to be made clear about this injunction that the trial court entered. Maintenance and support are defined as part of the accused products. The injunction does not prohibit the application of maintenance and support. The definition is qualified by the phrase at page four of your appendix, quote, to the extent they embody the enjoined capability. And that's defined and limited on page five to the patented functionality. There is no injunction against SAP providing maintenance and support to its customers. And I'll make one final point about the injunction. But can they perform maintenance on the customers who are using the functionality that has been found to infringe? I'm sorry, Your Honor, I missed it. Can they perform, no, they would agree. There's no prohibition on them providing maintenance to their customers on their product generally. But can they provide maintenance to their customers who are utilizing the infringing, now found to have infringed, functionality? They cannot. Why not? Because the royalty award stopped at the day of trial. There's no further licensing. But that's not right. Those customers are allowed to keep using it. The royalty award covered continued use by those individuals. So if SAP needs to maintain that software, that functionality for those individuals, why can't it? Because the implied license stopped at the day of trial. There is no implied license for those users anymore. Maybe I misunderstood. They have to, what, they have to go turn it off, take it back? What is it they have to do with the people who already have the software, for whom they've already paid you a royalty in the form of this damages award? Those people don't get to keep using it? I know they get expanded to new users, new seats, as Mr. Jakes referred to them, but I thought the existing seats got to keep occupying themselves. They get to keep using it. Right. So why can't they maintain it? Because the… You don't have a maintenance patent. You don't have any claims to maintenance. Why can't they keep maintaining it? You just admitted they have a royalty for those seats, for continued use of those seats. So why can't they maintain it for those customers in those seats? No, Your Honor, we don't agree that they have a license for continued use on those seats. The court's instruction said that the royalty award stops at the day of trial, and the implied license can only go so far as the royalty award. And so they can keep using it. We can't stop them from keep using it because the court… There was a suggestion that the court did make them take it out. And, in fact, the court had evidence that they can require it to be taken out. The patch in 2010 said it was required. I don't understand. This court did not require their customers to stop using it, the ones for whom they're paying $300 million in damages. They don't have to stop using it, right? They don't have to take it out. And they don't have to stop using it. That's right, Your Honor. So why can't they? If they don't have to stop using it, if they're not required by any rights that you have to stop using it, why aren't they allowed to maintain it? Well, as the trial court pointed out, this is revenue associated with future infringing activity. No, but they weren't barred from doing this in the future. So it's not future infringing activity. It's infringing activity that's already been compensated for by your own admission. They're not prohibited from having those thieves continue to use that software. So why can't they maintain it? You don't have a patent on maintenance. Well, Your Honor, the way this business works is that everybody buys maintenance, along with the software. It's part and parcel of the deal. The evidence was that everybody needs it and everybody uses it. This is infringing software. The trial court never said that this is not future infringing activity. The trial court just said, the SAP came in and said, Your Honor, don't make us take it out. And he said, OK, I'm not going to make you take it out. But until you take it out, and he considered it to be infringing activity, but in balancing the harm, he said, I'm not going to make you take it out. But you can't provide maintenance on that activity because it's part and parcel of your original infringing sale. And that was the evidence at trial. So I have nothing further unless the court has more questions. Thank you, Mr. McCall. Mr. Jakes, you have three minutes. Thank you, Your Honor. If I could first address the source code issue. Rosada's counsel referred to the testimony of their expert where he went into the source code. If you look at that testimony, all that shows is that SAP had hierarchical access generally. It had the ability to do hierarchical access. But that's not what the claims call for. And, in fact, the expert admitted that there wasn't an SAP access sequence that ran hierarchical access on customer hierarchies. That didn't exist. The software came with 100 pricing procedures and 150 condition types. And this access sequence on customer hierarchies was not one of them. And he admitted that. So simply going to the source code was not enough. As for the market switching issue and the objection to the methodology, Judge Rader, we did object at trial. That's at A370607 that he was switching markets, that that was not in his report. So I think that aspect of the objection was preserved. Now, Rosada's counsel also talked about the overall demand for this feature. He's talking about hierarchical access generally. It's not the specific limitations in the claims which require hierarchical access of both customer and product hierarchies to determine a single price. Those were the procedures that were not supplied by SAP and that there's no evidence that any SAP customer ever used. On the notion that SAP somehow destroyed the market in 1998, their chart is the most telling evidence. If that were true, the market for Oracle would have continued because SAP's providing this functionality would not have changed anything for Oracle. And as you can see, the sales dropped off for everybody. And simply because it happened after SAP added hierarchical access doesn't mean that it happened because of. And again, they took these – if you look at the actual numbers, the sales to SAP customers, Pricer-led sales in 1996 to 1998, there were eight of those sales. Never approached anything like 12, and that's over a three-year period. For them to extrapolate five years later that they would have made these sales at this rate up to 93-some sales, it's just not supported by the evidence. And finally, on the injunction, it does prohibit maintenance on ERP for those customers that have it, and it's to the software generally, not to the specific feature. The injunction doesn't say you can't maintain that feature. SAP can't maintain the tens of thousands of features in the SAP software being used by the customers. It's not infringing activity, and it shouldn't be enjoined. Thank you. Thank you, Mr. Jakes. The court will now take a recess. It will reconvene in just a few minutes to hear the In re Jaczynski case. Thank you, counsel. All rise. Thank you. Thank you. Thank you. Thank you.  This is Raiders, thank you. Right, yep. You got that? Yep. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you.